No. 22-40313

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARLAND HENRY GIBSON,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 6:21-CR-49-1

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

Brit Featherston
  United States Attorney
  Eastern District of Texas

Bradley Visosky
  Assistant United States Attorney
  101 E. Park Boulevard, Suite 500
  Plano, Texas 75074
  (972) 509-1201

ATTORNEYS FOR THE UNITED STATES

## Statement Regarding Oral Argument

Oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record Fed. R. App. P. 34(a)(2)(C).

# Table of Contents

**Page(s)**

Statement Regarding Oral Argument ................................................... i

Table of Authorities............................................................... iv

Statement of Jurisdiction.........................................................1

Statement of the Issues...........................................................1

Statement of the Case ............................................................2

Summary of Argument..........................................................4

Argument.....................................................................6

    Issue I: Gibson's challenge to the constitutionality of § 922(g)(1) does not raise an issue of subject-matter jurisdiction. ..................6

    Issue II: The district court correctly rejected Gibson's argument that § 922(g)(1) is unconstitutional.................................................7

    Issue III: The indictment was not defective. (Responsive to Gibson Issue IX, pp. 141-153)..................................................49

    Issue IV: Gibson's sundry complaints that the government pursued judicial process unlawfully and failed to promptly present him to a judicial officer are meritless. (Responsive to Gibson Issue X, pp. 153-167) ...............................................................51

    Issue V: The district court had subject-matter jurisdiction. (Responsive to Gibson Issue XI, pp. 168-172)...............................57

Conclusion ..................................................................58

Certificate of Service ...........................................................59

Certificate of Compliance ..................................................................... 60

# Table of Authorities

## Federal Cases                                              Page(s)

*Baze v. Rees,*
    553 U.S. 35 (2008) ................................................................... 39

*Binderup v. Attorney General,*
    836 F.3d 336 (3d Cir. 2016) ................................................... 11

*Bosarge v. Miss. Bureau of Narcotics,*
    796 F.3d 435 (5th Cir. 2015) .................................................. 49

*Campiti v. Garland,*
    No. 3:22-cv-177, 2023 WL 143173 (D. Conn. Jan. 10, 2023) .............. 17

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................... passim

*Folajtar v. Attorney General,*
    980 F.3d 897 (3d Cir. 2020) ........................................... passim

*Hamilton v. Pallozzi,*
    848 F.3d 614 (4th Cir. 2017) ................................................. 10

*Kaley v. United States,*
    571 U.S. 320 (2014) .............................................................. 49

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ................................................. 46

*Lewis v. United States,*
    445 U.S. 55 (1980) ................................................................ 47

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019) ....................................... passim

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ............................................................... 8

*New York State Rifle & Pistol Ass'n v. City of New York,*
    140 S. Ct. 1525 (2020) ......................................................... 13

*New York State Rifle & Pistol Association v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................. passim

*Range v. Attorney General,*
    53 F.4th 262 (3d Cir. 2022).......................................... passim

*Range v. Attorney General,*
    No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023) .................. 11, 17

*Richardson v. Ramirez,*
    418 U.S. 24 (1974) ......................................................... passim

*Spencer v. Kemna,*
    523 U.S. 1 (1998) ................................................... 21, 33, 40

*States v. Hill,*
    No. 22-cr-249, 2022 WL 17069855 (S.D. Tex. Nov. 17, 2022)............. 18

*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
    837 F.3d 678 (6th Cir. 2016).............................................. 22

*Walker v. United States,*
    No. 20-cv-31, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022)............... 18

*Wallach v. Van Riswick,*
    92 U.S. 202 (1875) ........................................................ 42

*Yohey v. Collins,*
    985 F.2d 222 (5th Cir. 1993)......................................... 52, 53

*United States v. Anderson,*
    559 F.3d 348 (5th Cir. 2009)............................................. 10

*United States v. Anderton*,
  752 F.2d 1005 (5th Cir. 1985)........................................................56, 57

*United States v. Baer*,
  235 F.3d 561 (10th Cir. 2000)..............................................................47

*United States v. Baker*,
  No. 2:20-cr-301, 2022 WL 16855423 (D. Utah Nov. 10, 2022).............18

*United States v. Broussard*,
  80 F.3d 1025 (5th Cir. 1996)................................................................47

*United States v. Bruton*,
  647 F.2d 818 (8th Cir. 1981)................................................................53

*United States v. Burrell*,
  No. 21-cr-20395, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022) ..........19

*United States v. Burton*,
  No. 3:22-cr-362, 2022 WL 16541139 (D.S.C. Oct. 28, 2022) ...............18

*United States v. Butts*,
  No. 22-cr33, --- F. Supp. 3d ----, 2022 WL 16553037 (D. Mont. Oct. 31, 2022)........................................................................................18

*United States v. Cage*,
  No. 3:21-cr-68, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022)...........18

*United States v. Caldwell*,
  302 F.3d 399 (5th Cir. 2002)................................................................50

*United States v. Campbell*,
  No. 22-cr-138, 2022 WL 17492255 (W.D. Okla. Sept. 27, 2022)..........19

*United States v. Carleson*,
  No. 3:22-cr-32, 2022 WL 17490753 (D. Alaska Oct. 28, 2022) ............18

*United States v. Carpenter*,
No. 1:21-cr-86, 2022 WL 16855533 (D. Utah Nov. 10, 2022)...............18

*United States v. Carrero*,
No. 2:22-cr-30, --- F. Supp. 3d ----, 2022 WL 9348792 (D. Utah Oct. 14, 2022).................................................................................................18

*United States v. Charles*,
No. 22-cr-154, --- F. Supp. 3d ----, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022).................................................................................................19

*United States v. Cockerham*,
No. 5:21-cr-6, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022) ..............19

*United States v. Coleman*,
No. 3:22-cr-8-2, 2023 WL 122401 (N.D. W. Va. Jan. 6, 2023) .............17

*United States v. Collette*,
No. 22-cr-141, --- F. Supp. 3d ----, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022).................................................................................................19

*United States v. Coombes*,
No. 22-cr-189, --- F. Supp. 3d ----, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022).................................................................................................19

*United States v. Crow*,
164 F.3d 229 (5th Cir. 1999)................................................................49

*United States v. Daniels*,
No. 1:03-cr-83, 2022 WL 5027574 (W.D.N.C. Oct. 4, 2022)................19

*United States v. Darrington*,
351 F.3d 632 (5th Cir. 2003).....................................................9, 47, 51

*United States v. Dawson*,
No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022)...........17

*United States v. Delpriore*,
No. 3:18-cr-136, --- F. Supp. 3d ---, 2022 WL 17490771 (D. Alaska Oct. 4, 2022)............................................................................................19

*United States v. Doty*,
No. 5:21-cr-21, 2022 WL 17492260 (N.D. W.Va. Sept. 9, 2022) ..........19

*United States v. Emerson*,
270 F. 3d 203 (5th Cir. 2001)..........................................................8, 41

*United States v. Everist*,
368 F. 3d 517 (5th Cir. 2004)..................................................................9

*United States v. Fauntleroy*,
488 F.2d 79 (4th Cir. 1973)...................................................................48

*United States v. Ford*,
No. 21-cr-00179, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022) .........18

*United States v. Garrett*,
No. 1:18-cr-880, 2023 WL 157961 (N.D. Ill. Jan. 11, 2023)................17

*United States v. Goins*,
No. 5:22-cr-00091, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022) ........17

*United States v. Gonzalez*,
No. 22-1212, 2022 WL 4376074 (7th Cir. Sept. 22, 2022) ...................46

*United States v. Good*,
No. 21-180-1-cr, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022) ..........18

*United States v. Grant*,
No. 3:22-cr-161, 2022 WL 16541138 (D.S.C. Oct. 28, 2022) ...............18

*United States v. Gray*,
No. 22-cr- 247, 2022 WL 16855696 (D. Colo. Nov. 10, 2022)..............18

*United States v. Grinage*,
   No. 21-cr-00399, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022) ........... 18

*United States v. Harper*,
   No. 21-cr-4085, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022) ............. 19

*United States v. Hill*,
   No. 21-cr-107, --- F. Supp. 3d ----, 2022 WL 4361917 (S.D. Cal. Sept.
   20, 2022) ........................................................................................... 19

*United States v. Hunter*,
   No. 1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022) ............. 17

*United States v. Ingram*,
   No. 0:18-cr-557, --- F. Supp. 3d ---, 2022 WL 3691350 (D.S.C. Aug. 25,
   2022) .................................................................................................. 19

*United States v. Jackson*,
   No. 21-cr-51, 2022 WL 4226229 (D. Minn. Sept. 13, 2022) ................. 19

*United States v. Jester*,
   139 F.3d 1168 (7th Cir. 1998) ............................................................. 48

*United States v. Jones*,
   No. 20-cr-00354, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022) ......... 18

*United States v. Jordan*,
   No. 22-cr-1140, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023) ............... 17

*United States v. Kaluza*,
   780 F.3d 647 (5th Cir. 2015) ....................................................... 6, 7, 57

*United States v. King,*
   No. 21-CR-255, 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022) ................. 19

*United States v. Law*,
   No. 20-cr-341, 2022 WL 17490258 (W.D. Pa. Oct. 27, 2022) ............... 18

*United States v. McCane,*
    573 F.3d 1037 (10th Cir. 2009)............................................................. 10

*United States v. McKenzie,*
    99 F.3d 813 (7th Cir. 1996)................................................................. 48

*United States v. Medrano,*
    No. 3:21-cr-39, 2023 WL 122650 (N.D. W. Va. Jan. 6, 2023)............... 17

*United States v. Melendrez-Machado,*
    No. 22-cr-634, --- F. Supp. 3d ----, 2022 WL 17684319 (W.D. Tex. Oct.
    18, 2022)........................................................................................... 18

*United States v. Minter,*
    No. 3:22-cr-135, --- F. Supp. 3d ----, 2022 WL 10662252 (M.D. Pa. Oct.
    18, 2022)........................................................................................... 18

*United States v. Mitchell,*
    No. 1:22-cr-111, 2022 WL 17492259 (S.D. Ala. Nov. 17, 2022) ........... 18

*United States v. Moore,*
    No. 3:20-cr-474, 2023 WL 154588 (D. Or. Jan. 11, 2023) .................... 17

*United States v. Moore,*
    No. 21-cr-121, 2022 WL 17490021 (W.D. Pa. Nov. 9, 2022) ................ 18

*United States v. Napier,*
    233 F.3d 394 (6th Cir. 2000)................................................................ 48

*United States v. Nevens,*
    No. 19-cr-774, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022) .............. 19

*United States v. Perez,*
    No. 3:21-cr-508, 2022 WL 17484969 (S.D. Cal. Sept. 26, 2022) .......... 19

*United States v. Price,*
    No. 2:22-cr97, --- F. Supp. 3d ----, 2022 WL 6968457 (S.D. W. Va. Oct.
    12, 2022)........................................................................................... 18

*United States v. Raheem*,
No. 3:20-cr-61, 2022 WL 10177684 (W.D. Ky. Oct. 17, 2022)..............18

*United States v. Rahimi*,
61 F.4th 443 (5th Cir. 2023) .................................................. 7, 14, 15, 23

*United States v. Ramos,*
No. 2:21-cr-395, 2022 WL 17491967 (C.D. Cal. Aug. 5, 2022)............19

*United States v. Reese*,
No. 19-cr-257, 2022 WL 16796771 (W.D. Pa. Nov. 8, 2022) ...............18

*United States v. Ridgeway*,
No. 22cr-175, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022) ...............18

*United States v. Riley*,
No. 1:22-cr-163, --- F. Supp. 3d ----, 2022 WL 7610264 (E.D. Va. Oct.
13, 2022).........................................................................................18

*United States v. Rozier*,
598 F.3d 768 (11th Cir. 2010).............................................................10

*United States v. Scroggins*,
599 F.3d 433 (5th Cir. 2010)....................................................9, 51, 53

*United States v. Scruggs*,
714 F.3d 258 (5th Cir. 2013).............................................................58

*United States v. Siddoway*,
No. 1:21-cr-205, 2022 WL 4482739 (D. Idaho Sept. 27, 2022)............19

*United States v. Spalding*,
894 F.3d 173 (5th Cir. 2018).............................................................52

*United States v. Spencer*,
No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022) ...........17

*United States v. Teerlink,*
  No. 2:22-cr-0024, 2022 WL 17093425 (D. Utah Nov. 21, 2022)...........18

*United States v. Threadgill,*
  172 F.3d 357 (5th Cir. 1999)...............................................................50

*United States v. Trinidad,*
  No. 21-cr-398, 2022 WL 10067519 (D.P.R. Oct. 17, 2022) ..................18

*United States v. Uni Oil, Inc.,*
  710 F.2d 1078 (5th Cir. 1983)..............................................................58

*United States v. Wagoner,*
  No. 20-cr-00018, 2022 WL 17418000 (W.D. Va. Dec. 5, 2022) ............18

*United States v. Wilkes,*
  20 F.3d 651 (5th Cir. 1994)...................................................................51

*United States v. Williams,*
  341 U.S. 58 (1951) ...................................................................................6

*United States v. Williams,*
  679 F.2d 504 (5th Cir. 1982)................................................................50

*United States v. Williams,*
  No. 1:21-cr-00362, 2022 WL 17852517 (N.D. Ga. Dec. 22 .............17, 19

*United States v. Willis,*
  No. 22-cr-00186, 2022 WL 17177470 (D. Colo. Nov. 23, 2022)...........18

*United States v. Wondra,*
  No. 1:22-cr-00099, 2022 WL 17975985 (D. Idaho Dec. 27, 2022) ........17

*United States v. Young,*
  No. 22-cr-54, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022) ..................18

## Federal Statutes and Rules

18 U.S.C. § 922(g) ....................................................................... 45

18 U.S.C. § 922(g)(1) ........................................................... passim

18 U.S.C. § 3161(c)(1) ................................................................ 55

18 U.S.C. § 3161(j)(1) ......................................................... 2, 5, 55

18 U.S.C. § 3231 ............................................................. 1, 4, 6, 57

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1865(b)(5) .............................................................. 21

Fed. R. App. P. 32(a)(5) ............................................................ 59

Fed. R. App. P. 32(a)(6) ............................................................ 59

Fed. R. App. P. 32(a)(7)(B) ....................................................... 59

Fed. R. App. P. 32(f) ................................................................. 59

Fed. R. App. P. 34(a)(2)(C) .......................................................... i

## Other Authorities

Colo. Rev. Stat. § 18-12-203(1)(c) ............................................ 12

Kan. Stat. Ann. § 75-7c04(a)(2) ................................................ 12

La. Stat. Ann. § 40:1379.3(C)(6) ............................................... 12

Mass. Const. of 1780 ................................................................. 34

Miss. Code. Ann. § 45-9-101(2)(d) ............................................ 12

N.C. Gen. Stat. § 14-415.12(b)(1) ............................................................... 12

N.H. Rev. Stat. Ann. § 159:6(I)(a) .............................................................. 12

Tex. Gov't Code Ann. § 411.172(a)(3) ........................................................ 12

W. Va. Code § 61-7-4(b)(5) .......................................................................... 12

*Firearms Owners' Protection Act,*
   Pub. L. No. 99-308 (1986) ...................................................................... 45

1777 Pa. law ................................................................................................. 33

*Dignity Takings in the Criminal Law of Seventeenth-Century England*
*and the Massachusetts Bay Colony,*
   92 Chi.-Kent L. Rev. 743 (2017) ..................................................... 30, 37

*The Public Acts of the General Assembly of North Carolina* 231 (1804)
   (1777 N.C. law) ...................................................................................... 32

*The Historical Justification for Prohibiting Dangerous Persons from*
*Possessing Arms,*
   20 Wyo. L. Rev. 249 (2020) ................................................................... 46

*Federal Firearms Act,*
   Pub. L. No. 75-785 (1938) ...................................................................... 45

*An Act to Strengthen the Federal Firearms Act,*
   Pub. L. No. 87-342 (1961) ...................................................................... 45

*Omnibus Crime Control and Safe Streets Act of 1968,*
   Pub. L. No. 90-351 (1968) ...................................................................... 45

*Gun Control Act of 1968,*
   Pub. L. No. 90-618 (1968) ...................................................................... 45

*Reviving the Excessive Fines Clause,*
   102 Cal. L. Rev. 277 (2014) ....................................................... 40, 41, 42

*Being A Collection of All the Laws of Virginia*
255-56 (1823) (1643 Va. law)................................................29

*Being A Collection of All the Laws of Virginia*
481-82 (1823) (1680 Va. law)................................................29

## Statement of Jurisdiction

Marland Henry Gibson appeals his conviction in a criminal case. The district court (Barker, J.) had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

Gibson purports to raise 11 issues in his 172-page brief. Gibson's Issues II through VIII, however, are either merely principles of law or pertain to Gibson's argument that § 922(g)(1) is facially unconstitutional. The government perceives five issues raised in the appeal:

Issue I: Whether Gibson's challenge to the constitutionality of § 922(g)(1) raises an issue of subject-matter jurisdiction.

Issue II: Whether the district court erred in finding § 922(g)(1) constitutional.

Issue III: Whether the indictment was defective for failing to explicitly say that the grand jury found that probable cause existed for each element of the charged § 922(g)(1) offense.

Issue IV: Whether the district court plainly erred by failing to find that the government failed to lawfully pursue judicial process or to present Gibson to a judicial officer under 18 U.S.C. § 3161(j)(1).

Issue V: Whether the district court lacked subject-matter jurisdiction over the case because the indictment did not recite the jurisdictional statutes giving rise to jurisdiction.

## Statement of the Case

A grand jury charged Gibson with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). ROA.12. The indictment alleged that Gibson, in 1995, had been convicted in an Indiana court of robbery (armed or bodily injury), burglary, criminal confinement, and dealing in a sawed-off shotgun, and that, in 2015 he had been convicted in an Indiana court of unlawful possession of a firearm by a serious violent felon. ROA.12. The indictment alleged that Gibson, knowing that he had been convicted of these felony offenses, knowingly and unlawfully possessed, "in and affecting commerce," a .45 caliber handgun as well as a multi-caliber handgun. ROA.12.

Before trial, Gibson, proceeding pro se, filed a motion to dismiss the indictment on seven grounds. ROA.39-106. One of them was that §

922(g)(1) is unconstitutional under the Second and Ninth Amendments to the Constitution. ROA.95-105. The district court denied the motion, finding that none of the grounds presented by Gibson had merit. ROA.185-195.

Gibson was tried and convicted. ROA.1531. On the day of the sentencing hearing, Gibson filed an 82-page motion to dismiss for "want of subject-matter jurisdiction." ROA.695-781. Gibson claimed that § 922(g)(1) was facially unconstitutional based on the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). At the sentencing hearing, the district court noted that it had received a copy of the motion earlier that day and had reviewed it in chambers. ROA.1324. The court orally denied the motion, ROA.1350, explaining that "nothing in the Supreme Court's intervening ruling in *Bruen* changes the analysis from my conclusion in my ruling" denying Gibson's pretrial motion to dismiss, ROA.1344.

The district court varied downward from the guidelines' range of 77-96 months' imprisonment and imposed a 48-month prison term. ROA.1373-74. Gibson timely filed a notice of appeal. ROA.405-06.

## Summary of Argument

I.    A constitutional attack on the statute of conviction is not a jurisdictional challenge but an issue on the merits. The district court plainly had subject-matter jurisdiction over this case under 18 U.S.C. § 3231 because the indictment alleged an offense against the laws of the United States.

II.    Gibson fails to show that § 922(g)(1) is unconstitutional. This Court has upheld that provision multiple times, relying on the Supreme Court's statement that such provisions are presumptively lawful. *Bruen* does not call into question this Court's prior decisions upholding § 922(g)(1). In fact, the concurring justices in *Bruen* reiterated the lawfulness of felon-dispossession statutes. Because *Bruen* does not overrule this Court's precedents, they are binding and require affirmance.

Even if the Court were to consider the issue afresh, § 922(g)(1) is constitutional after *Bruen*. The Second Amendment's text does not prevent disarming felons, both because felons can be excluded from the political community and because the Amendment codified a pre-existing right that excluded felons. Moreover, *Heller* and *Bruen* interpreted the

Amendment's text as protecting the rights of "law-abiding citizens," which necessarily excludes felons. And *Bruen* endorsed the "shall-issue" firearm-carry licensing schemes of states that specifically deny licenses to felons.

Section 922(g)(1) is also consistent with the historical tradition of firearm regulation. When the Second Amendment was adopted, persons convicted of felonies were regularly subject to severe penalties, including death and forfeiture of their entire estates. Additionally, colonial and state legislatures possessed the unquestioned power to disarm citizens seen as being untrustworthy or outside the political community. Although not identical to § 922(g)(1), these statutes are relevantly similar and demonstrate that § 922(g)(1) is constitutional.

III.    A grand jury returned the indictment in this case, which alleged each element of a § 922(g)(1) offense. The return of the indictment meant that the grand jury found that probable cause existed on each element.

IV.    The district court did not plainly err in failing to find that the government failed to lawfully pursue judicial process or to present Gibson to a judicial officer under 18 U.S.C. § 3161(j)(1).

V.    The district court did not lack subject-matter jurisdiction over the case just because the indictment did not rotely say something like "Jurisdiction is invoked under 18 U.S.C. § 3231." That the indictment charged a violation of § 922(g)(1) — an offense against the laws of the United States — was enough to secure subject-matter jurisdiction.

## Argument

## I.    Gibson's challenge to the constitutionality of § 922(g)(1) does not raise an issue of subject-matter jurisdiction. (Responsive to Gibson Issue I, pp. 49-50).

### Standard of Review

This Court review's the district court's determination of subject-matter jurisdiction de novo. *See United States v. Kaluza*, 780 F.3d 647, 653 (5th Cir. 2015).

### Discussion

In his first issue and throughout his brief, Gibson contends that the district court lacked subject-matter jurisdiction over this case because Gibson believes that 18 U.S.C. § 922(g)(1) is unconstitutional. But a constitutional attack on the statute of conviction is not a jurisdictional challenge. *United States v. Williams*, 341 U.S. 58, 66

(1951) ("Even the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction").

"In the criminal context, subject matter jurisdiction is straightforward." *Kaluza*, 780 F.3d at 654. Section 3231 of Title 18 of the U.S. Code provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." Here the indictment alleged that Gibson violated 18 U.S.C. § 922(g)(1), an offense against the laws of the United States. The district court had subject-matter jurisdiction.

## II. The district court correctly rejected Gibson's argument that § 922(g)(1) is unconstitutional. (Responsive to Gibson Issues II-VIII, pp. 51-140)

### Standard of Review

This Court's review of Gibson's facial challenge to § 922(g)(1) is de novo. *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2023).

### A. This Court's precedent upholding longstanding prohibitions on firearm possession by felons forecloses Gibson's Second Amendment challenge.

The Constitution protects an individual right to keep and bear arms, but "[l]ike most rights, the right secured by the Second

Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Thus, a "variety" of firearm regulations are consistent with the Second Amendment. *Id.* at 636. In recognizing an individual right to bear arms, the Supreme Court in *Heller* cautioned that "nothing in [the Court's] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. And in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

In *United States v. Emerson*, 270 F. 3d 203 (5th Cir. 2001), this Court recognized that the Second Amendment "protects the rights of individuals to privately possess and bear their own firearms" but that those rights are subject to "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id.* at 261. Restrictions on the possession of firearms by felons were

among them. *Id.* ("it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms"). The Court continued to reject Second Amendment challenges to the constitutionality of § 922(g)(1) after *Emerson. See, e.g.*, *United States v. Darrington*, 351 F.3d 632, 633-34 (5th Cir. 2003) (holding that § 922(g)(1) "does not violate the Second Amendment"); *United States v. Everist*, 368 F. 3d 517, 519 (5th Cir. 2004) ("It is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms").

Then came *Heller* in 2008, yet this Court concluded that *Heller* did nothing to change this Court's jurisprudence on Second Amendment challenges to § 922(g)(1). In *United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010), the Court explained that "[p]rior to *Heller*, this circuit had already recognized an individual right to bear arms, and had determined that criminal prohibitions on felons (violent or non-violent) possessing firearms did not violate that right." *Id.* at 451 (cleaned up). Indeed, the Court noted that *Heller* "should not 'be taken to cast doubt on longstanding prohibitions on possession of firearms by felons[.]'" *Id.* (quoting *Heller*, 554 U.S. at 626). The Court concluded that the

defendant had presented "no Second Amendment argument that our cases have not already considered and rejected." *Id.*; *see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) ("*Heller* provides no basis for reconsidering *Darrington*").

Other circuits have likewise rejected challenges to Section 922(g)(1). *See, e.g.*, *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam) (holding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment"); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (recognizing that the Supreme Court in *Heller* "explicitly stated" that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"); *accord Hamilton v. Pallozzi*, 848 F.3d 614, 625-27 (4th Cir. 2017) ("hold[ing] that a challenger convicted of a state law felony generally cannot satisfy step one" of the then prevailing framework). Indeed, "no circuit" has ever "held [18 U.S.C. § 922(g)(1)] unconstitutional as applied" to an individual convicted of an offense

labeled a felony. *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (rejecting as-applied challenge by individual convicted of felony fraud).[1]

Here, the district court correctly applied the Supreme Court's guidance in *Heller* that "'longstanding prohibitions on the possession of firearms by felons' are not constitutionally invalid." ROA.190. And since *Heller*, the Supreme Court has twice reaffirmed—first in *McDonald*, then in *Bruen*—that the right to bear arms is limited to law-abiding citizens. Indeed, *Bruen* defines the Second Amendment as belonging to "law-abiding" citizens 14 times. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156 (2022). Consistent with that principle, while *Bruen* invalidated New York's "may-issue" licensing regime, it approved

---

[1] Some courts of appeals before *Bruen* left open the theoretical possibility of a successful as-applied challenge to § 922(g)(1), but the only court of appeals decision holding the statute unconstitutional in any of its applications is *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016), where a narrow majority of the en banc Third Circuit held § 922(g)(1) unconstitutional as applied to two state-law misdemeanants. Gibson's challenge would have failed under that decision because his underlying convictions were unquestionably felonies. *See, e.g.*, *Folajtar v. Attorney General*, 980 F.3d 897, 910 (3d Cir. 2020) (rejecting as-applied challenge under the *Binderup* framework where underlying offense was for felony tax fraud); *see also Range v. Attorney General*, No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023) (reflecting that the en banc Third Circuit will again be considering an as applied Second Amendment challenge to Section 922(g)(1) by a state-law misdemeanant).

"shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course."[2] *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). The Court explained that such regimes—many of which prohibit the issuance of licenses to felons—generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (majority op.) (quoting *Heller*, 554 U.S. at 635); *see also, e.g.*, Colo. Rev. Stat. § 18-12-203(1)(c); Ga. Code Ann. § 16-11-129(b)(2)(B); Kan. Stat. Ann. § 75-7c04(a)(2); La. Stat. Ann. § 40:1379.3(C)(6); Miss. Code. Ann. § 45-9-101(2)(d); N.H. Rev. Stat. Ann. § 159:6(I)(a); N.C. Gen. Stat. § 14-415.12(b)(1); 18 Pa. Cons. Stat. § 6109(e)(1)(viii); Tex. Gov't Code Ann. § 411.172(a)(3) (West); W. Va. Code § 61-7-4(b)(5). That reasoning underscores that § 922(g)(1), which likewise aims to ensure that "those bearing arms" are "'law-abiding, responsible citizens,'" accords with the

---

[2] A "shall-issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may-issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id.* at 2124.

Second Amendment. *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

*Bruen* stressed that it was "reiterat[ing]" *Heller*'s approach, clarifying the legal standard "[i]n keeping with *Heller*," and "apply[ing]" the "test that [the Court] set forth in *Heller*." 142 S. Ct. at 2126, 2129, 2131. Indeed, Justices who joined the Court's decision in *Bruen* took pains to underscore the limits of the decision, including specifically with respect to felon-possession prohibitions. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quotation marks omitted)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)).[3]

---

[3] In total, eight members of the *Bruen* Court have joined at least one opinion expressly approving of *Heller*'s and *McDonald*'s reassurances regarding felon-dispossession statutes. The three dissenters in *Bruen* agreed with the concurrences cited in the text that "the Court's opinion" should be understood as "cast[ing] no doubt on [the] aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms. *Bruen*, 142 S. Ct. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting). And two years earlier, Justices Thomas and Gorsuch also agreed that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v.*

Because *Bruen*'s "holding decide[d] nothing about who may lawfully possess a firearm," *id.* at 2157 (Alito, J., concurring), the Supreme Court's decision plainly does not abrogate this Court's prior decisions holding that felons may be categorically prohibited from possessing firearms.

Nor did (or could) this Court's recent decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), abrogate earlier Fifth Circuit decisions upholding the constitutionality of § 922(g)(1). *Rahimi* held that § 922(g)(8)'s prohibition on firearm possession by those subject to domestic violence restraining orders is unconstitutional after *Bruen*.[4] If anything, *Rahimi* reinforced this Court's precedent that felon-dispossession laws are constitutional under the Second Amendment. *Rahimi* explained that *Heller* used the phrase "'law-abiding, responsible citizens' as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding prohibitions on the

---

*City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).

    [4] The government disagrees with the holding of *Rahimi* and has filed a petition for writ of certiorari in the Supreme Court, 2023 WL 2600091 (March 17, 2023).

possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .'" *Id.* at 452 (quoting *Heller*, 554 U.S. at 626-27). The panel noted that "Rahimi was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him" from the "political community" within the scope of the Second Amendment. *Id.* The panel thus described laws prohibiting convicted felons from possessing firearms as one such "longstanding prohibition."

*Bruen* did abrogate a separate aspect of this Court's Second Amendment precedent that has no bearing on the issue here. As *Bruen* explained, the courts of appeals had generally adopted a "two-step" Second Amendment framework, first ascertaining whether a law regulates activity falling within the scope of the constitutional right based on its original historical meaning, then applying means-end scrutiny. *Bruen*, 142 S. Ct. at 2126-27. *Bruen* held that whereas "[s]tep one" is "broadly consistent with *Heller*," "*Heller* and *McDonald* do not support applying means-end scrutiny." *Id.* at 2127-30. In any event, §

922(g)(1) passes constitutional muster under the framework articulated by *Bruen*.

**B.    Text and history confirm that 18 U.S.C. § 922(g)(1) is consistent with the Second Amendment.**

**1.    The text of the Second Amendment and its historical context make plain that Gibson, a convicted felon, cannot mount a successful attack on 18 U.S.C. § 922(g)(1).**

Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Text and history shows that the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses. *See Medina*, 913 F.3d at 157-61 ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) (holding that "those who have demonstrated disregard for

the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon granting of rehearing en banc*, No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023).[5]  In at least 86 cases since *Bruen*, district courts have rejected Second Amendment challenges to § 922(g)(1) based on text, history, precedent, or a combination of the three, and we are not aware of any case in which a court has held § 922(g)(1) unconstitutional under *Bruen*.[6]

---

[5] Though the panel opinion in *Range* has been vacated pending rehearing en banc, the opinion is persuasive.

[6] *See United States v. Spencer*, No. 2:22-cr-561, Dkt. No. 24 (S.D. Tex. Jan. 12, 2023); *United States v. Moore*, No. 3:20-cr-474, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States v. Jordan*, No. 22-cr-1140, 2023 WL 157789 (W.D. Tex. Jan. 11, 2023); *United States v. Garrett*, No. 1:18-cr-880, 2023 WL 157961 (N.D. Ill. Jan. 11, 2023); *Campiti v. Garland*, No. 3:22-cv-177, 2023 WL 143173 (D. Conn. Jan. 10, 2023); *United States v. Coleman*, No. 3:22-cr-8-2, 2023 WL 122401 (N.D. W. Va. Jan. 6, 2023); *United States v. Medrano,* No. 3:21-cr-39, 2023 WL 122650 (N.D. W. Va. Jan. 6, 2023)*; United States v. Olson*, No. 1:22-cr-20525, Dkt. No. 33 (S.D. Fla. Jan. 5, 2023); *United States v. Wondra*, No. 1:22-cr-00099, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Jones*, No. 5:22-cr-376, Dkt. No. 59 (W.D. Okla. Dec. 23, 2022); *United States v. Williams*, No. 1:21-cr-00362, 2022 WL 17852517 (N.D. Ga. Dec. 22, 2022); *United States v. Dawson*, No. 3:21-cr-293, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022); *United States v. Goins*, No. 5:22-cr-00091, 2022 WL 17836677 (E.D. Ky. Dec. 21, 2022); *United States* v. *Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022); *United States v. Hunter*, No. 1:22-cr-84, 2022 WL 17640254 (N.D. Ala. Dec. 13, 2022); *United States v. Spencer*, No. 2:22-cr-106, 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States v. Dotson*, No. 3:22cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022); *United States v. Tran*, No. 3:22cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022); *United States v. Fencl*, No. 3:21cr-3101, Dkt.

No. 81 (S.D. Cal. Dec. 7, 2022); *United States v. Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States v. Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States v. Grinage*, No. 21-cr-00399, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States v. Wagoner*, No. 20-cr-00018, 2022 WL 17418000, at *5-8 (W.D. Va. Dec. 5, 2022); *United States v. Gay*, No. 4:20-cr-40026, Dkt. No. 412 (C.D. Ill. Dec. 5, 2022); *United States v. Glaze*, No. 5:22-cr-425, Dkt. No. 23 (W.D. Okla. Dec. 1, 2022); *United States v. Ford*, No. 21-cr-00179, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States v. Jones*, No. 20-cr-00354, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States v. Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022); *United States v. Cage*, No. 3:21-cr-68, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022); *United States v. Willis*, No. 22-cr-00186, 2022 WL 17177470 (D. Colo. Nov. 23, 2022); *United States v. Teerlink*, No. 2:22-cr-0024, 2022 WL 17093425 (D. Utah Nov. 21, 2022); *United States v. Good*, No. 21-180-1-cr, 2022 WL 18107183 (W.D. Mo. Nov. 18, 2022), *report and recommendation adopted*, 2023 WL 25725 (W.D. Mo. Jan. 3, 2023); *United States v. Brunson*, No. 22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022); *United States v. Hill*, No. 22-cr-249, 2022 WL 17069855 (S.D. Tex. Nov. 17, 2022); *United States v. Blackburn*, No. 1:22-cr-209, Dkt. No. 28 (M.D. Pa. Nov. 17, 2022); *United States v. Mitchell*, No. 1:22-cr-111, 2022 WL 17492259 (S.D. Ala. Nov. 17, 2022); *United States v. Dumont*, No. 22-cr-53 (D.N.H. Nov. 14, 2022); *United States v. Baker*, No. 2:20-cr-301, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States v. Carpenter*, No. 1:21-cr-86, 2022 WL 16855533, at *4 (D. Utah Nov. 10, 2022); *United States v. Gray*, No. 22-cr- 247, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Moore*, No. 21-cr-121, 2022 WL 17490021 (W.D. Pa. Nov. 9, 2022); *United States v. Reese*, No. 19-cr-257, 2022 WL 16796771 (W.D. Pa. Nov. 8, 2022); *United States v. Young*, No. 22-cr-54, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022); *United States v. Butts,* No. 22-cr33, --- F. Supp. 3d ----, 2022 WL 16553037 (D. Mont. Oct. 31, 2022); *United States v. Burton*, No. 3:22-cr-362, 2022 WL 16541139 (D.S.C. Oct. 28, 2022); *United States v. Carleson*, No. 3:22-cr-32, 2022 WL 17490753 (D. Alaska Oct. 28, 2022); *United States v. Grant*, No. 3:22-cr-161, 2022 WL 16541138 (D.S.C. Oct. 28, 2022); *Walker v. United States*, No. 20-cv-31, 2022 WL 16541183, at *34 (S.D. Cal. Oct. 28, 2022); *United States v. Law*, No. 20-cr-341, 2022 WL 17490258 (W.D. Pa. Oct. 27, 2022); *United States v. Borne*, No. 22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Minter*, No. 3:22-cr-135, --- F. Supp. 3d ----, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022); *United States v. Melendrez-Machado*, No. 22-cr-634, --- F. Supp. 3d ----, 2022 WL 17684319 (W.D. Tex. Oct. 18, 2022); *United States v. Raheem*, No. 3:20-cr-61, 2022 WL 10177684, at *1-4 (W.D. Ky. Oct. 17, 2022); *United States v. Ridgeway*, No. 22cr-175, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Trinidad*, No. 21-cr-398, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States v. Carrero*, No. 2:22-cr-30, --- F. Supp. 3d ----, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Ortiz*, No. 21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States v. Riley*, No. 1:22-cr-163, --- F. Supp. 3d ----, 2022 WL 7610264, at *6-13 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 2:22-cr97,

Felon disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Simply put, the right "to keep and

---

--- F. Supp. 3d ----, 2022 WL 6968457, at *6-9 (S.D. W. Va. Oct. 12, 2022); *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 5240928, at *4-5 (S.D.N.Y. Oct. 6, 2022); *United States v. Daniels*, No. 1:03-cr-83, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 22-cr-154, --- F. Supp. 3d ----, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Campbell*, No. 22-cr-138, 2022 WL 17492255 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 1:21-cr-205, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Perez*, No. 3:21-cr-508, 2022 WL 17484969 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 22-cr-141, --- F. Supp. 3d ----, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No. 3:18-cr-136, --- F. Supp. 3d ---, 2022 WL 17490771 (D. Alaska Oct. 4, 2022); *United States v. Coombes*, No. 22-cr-189, --- F. Supp. 3d ----, 2022 WL 4367056, at *1-11 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21-cr-107, --- F. Supp. 3d ----, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 21cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 5:21-cr-6, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. 21-cr-51, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 21-cr- 1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 5:21-cr-21, 2022 WL 17492260 (N.D. W.Va. Sept. 9, 2022); *United States v. Harper*, No. 21-cr-4085, 2022 WL 8288406, at *2 (N.D. Iowa Sept. 9, 2022), *report and recommendation adopted*, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Burrell*, No. 21-cr-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 3:22-cr-20, Dkt. No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 0:18-cr-557, --- F. Supp. 3d ---, 2022 WL 3691350 (D.S.C. Aug. 25, 2022); *United States v. Nevens*, No. 19-cr-774, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 22-cr-149, Dkt. No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 20-cr-628 (S.D.N.Y. Aug. 10, 2022); *United States v. Ramos*, No. 2:21-cr-395, 2022 WL 17491967 (C.D. Cal. Aug. 5, 2022); *United States v. Doss*, No. 4:21-cr74, Dkt. No. 126 (S.D. Iowa Aug. 2, 2022); *United States v. Maurice*, No. 22-cr48 (S.D.N.Y. Jul. 14, 2022).

bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

The Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A*

*Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"— including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48, 48  (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

It remains that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (first citing 28 U.S.C. § 1865(b)(5), which bars convicted felons from serving on a federal jury; and then citing *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), which upheld state felon disenfranchisement); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that

consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, § 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction[.]" *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626).

*Heller* makes clear that the Second Amendment's protections are limited to those who are "members of the political community" and "law-abiding, responsible citizens." 554 U.S. at 580, 635. Indeed, this Court, in *Rahimi*, recognized that "*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion

groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated our would have tolerated." *Rahimi*, 61 F.4th at 452 (quoting *Heller*, 554 U.S. at 627 n. 26). One of those groups, of course, was felons.

*Bruen* makes particularly plain that those who are not law-abiding and responsible cannot successfully challenge laws that apply to them based on that status. As noted above, on 14 occasions *Bruen* defined the Second Amendment as belonging to "law-abiding" citizens. 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Id.* at 2134. In another passage, noted above at pp. 12-13, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding*

citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

That non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text also explains the Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons. *Heller*, 554 U.S. at 626-27, 627 n.26, 635. In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights," *id.* at 635. Gibson, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.*; *see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane"). Laws such as § 922(g)(1) are therefore

constitutional under the Second Amendment's text as informed by a

variety of "historical justifications," *id.* at 635.

> ## 2.    A comprehensive review of historical tradition confirms legislatures' authority to prohibit felons from possessing firearms.

A comprehensive review of "this Nation's historical tradition of

firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of

laws disarming people because of felony convictions, whether or not the

felonies were violent. Beginning in England and lasting at least through

the founding era, history is replete with "representative historical

analogue[s]" for § 922(g)(1) that shed light on the scope of the Second

Amendment and the power of legislatures. *Id.* at 2133-34 (emphasis

omitted). Two types of historical laws are particularly pertinent: (a)

laws categorically disqualifying groups from possessing firearms based

on a judgment that the group could not be trusted to adhere to the rule

of law; and (b) laws authorizing capital punishment and estate

forfeiture for felonies.

> ### a.    Firearm disqualification laws

By the time of the Second Amendment's ratification in 1791, there

was a robust tradition of legislatures exercising broad authority to

"categorically disqualif[y] people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. Compelling evidence from the constitutional ratification debates confirms that in light of this longstanding tradition of analogous regulation, the founders also understood that the precise type of regulation at issue in this case is constitutional: a legislature would not, in the founders' view, infringe the right to bear arms by "disarming the people . . . for crimes committed." *See infra* p. 36 (quotation marks omitted) (discussing Pennsylvania Antifederalists' proposal in 1787).

**England.** Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"— which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. In 1689, for example, the government passed an "Act for the better secureing the Government by disarming Papists and

reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[7]  Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith would have "disrespect for and disobedience to the Crown and English law." *Range*, 53 F.4th at 275. Far from "rest[ing] on the implausible premise that all Catholics were violent," *id.*, the statute made clear that its concern was with propensity to disobey the

---

[7] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords 1685-1691*, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights [1688]*, https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"—including the English Bill of Rights, discussed below, which was similarly enacted in 1689).

27

sovereign by providing that anyone who decided to make the declaration after having previously refused would regain the ability to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in* 6 *The Statutes of the Realm*, *supra*, at 72.

This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). That predecessor specified that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (cleaned up). And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the members of that class had failed to demonstrate that they would abide by the law, whether or not they had previously exhibited violence.

***Colonial America.*** The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy. Firearm regulations directed toward disarming Native Americans and Black people were pervasive.[8]  These specific "status-based regulations of this period are repugnant (not to mention unconstitutional)," *Range*, 53 F.4th at 276 n.18, but "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white

---

[8] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law);  6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws," *id.* at 276. Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because of their "disavowal of the rule of law" and failure to demonstrate "obedience to the commands of the government." *Id.* (first citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937); then citing Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); then citing James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); and then citing John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)). To take another example, during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law). Like the English law discussed above, the Virginia statute tied disarmament to failure to

take a loyalty oath—and exempted those who took the oath after previously refusing. *Id.* at 38.

***The Revolutionary War.*** Over the course of the Revolutionary War, American legislatures passed numerous laws "disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—often specifically targeting those who failed to demonstrate loyalty to the emergent American government. *Range*, 53 F.4th at 277. An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14,

1776). At least six of the governments enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

The enacting legislatures, like their historical predecessors, made categorical judgments about disarmament that were not tied to an individual's past violent acts but rather to the legislature's judgment about who is included among the law-abiding, trustworthy members of the political community. A common feature of this set of laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at

229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* pp. 21-22. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

A law like Connecticut's, disarming those who had libeled the government, certainly does not "narrowly target citizens who committed inherently violent or dangerous crimes." *Folajtar v. Attorney General*, 980 F.3d 897, 909 (3d Cir. 2020). The Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 53 F.4th at 278. That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins*

278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights*, *supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in The Complete Bill of Rights*, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above). And the Virginia law required those who were disarmed to attend militia trainings and run drills without weapons—a consequence reinforcing the "social function" of publicly identifying those who were not "law-abiding members of the civic community," and a consequence that is not compatible with conceiving of those who were disarmed as "dangerous spies or threats of violence," *Range*, 53 F.4th at 279. *See* 1777 Va. law at 282 ("[T]he person so disarmed shall, nevertheless, be obliged to attend musters[] . . . .").

In sum, the disarmament measures adopted during this early period of the Republic reflect that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the

law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms." *Range*, 53 F.4th at 279.

***Ratification debates.*** The historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One "Second Amendment precursor[]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great

importance in the history of the federal Bill of Rights"). And the

Pennsylvania Antifederalists' proposed constitutional amendment

regarding the right to bear arms stated that: "no law shall be passed for

disarming the people or any of them *unless for crimes committed*, or real

danger of public injury from individuals." *Id.* at 665 (emphasis added).

Thus, the founding generation recognized that "crimes

committed"— violent or not—can supply an independent ground for a

legislature to prohibit firearm possession. As the D.C. Circuit explained,

"[t]he use of the word 'or'" in this proposal reflects that "criminals, in

addition to those who posed a 'real danger,'" have historically been

"proper subjects of disarmament." *Medina*, 913 F.3d at 158-59.

The Pennsylvania Antifederalists were not alone in proposing a

Second Amendment precursor that expressly permitted laws disarming

untrustworthy people. At the Massachusetts convention, Samuel Adams

proposed an amendment providing that the "Constitution be never

construed to authorize Congress . . . to prevent the people of the United

States, *who are peaceable citizens*, from keeping their own arms." 2

Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks

omitted). And in New Hampshire, the convention recommended an

amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry— so the proposals cannot be "shoehorn[ed] . . . into the silo of dangerousness." *Folajtar*, 980 F.3d at 908-09.

The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment,"

because this limitation "was understood"). Given the language of these influential proposals along with the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

**Summary.** Each regulation discussed above demonstrates that the founders inherited a tradition under which a legislature has broad discretion to disarm classes of people they did not trust to follow the law. And collectively, the effect was that only a subset of the founding generation would have "fully enjoyed the right to keep and bear arms." Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 116 (2011) (explaining that the founders "were perfectly willing to confiscate weapons from anyone deemed untrustworthy").

### b. Felony punishment laws

In a separate vein, for centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar*, 980 F.3d at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of

felonies punishable by death, including not only offenses like treason,

murder on federal land, and piracy on the high seas, but also nonviolent

conduct relating to forging or counterfeiting a public security. *See* An

Act for the Punishment of Certain Crimes Against the United States, 1

Stat. 112-15 (1790). States in the early Republic likewise treated

"nonviolent crimes such as forgery and horse theft" as "capital offenses."

*Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific

examples of individuals in Georgia who "escaped from jail after being

condemned to death" for "forgery" or "horse-stealing"). And many

American jurisdictions up through the end of the 1700s authorized

complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the*

*Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276

(2014) (citing statutes).

A few examples of state laws demonstrate the severe

consequences of committing a felony at the time. In 1788, just three

years before the Second Amendment's ratification, New York passed a

law providing for the death penalty for crimes including counterfeiting

(as well as burglary, robbery, arson, and malicious maiming and

wounding). 2 *Laws of the State of New York Passed at the Sessions of the*

*Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act established that every person convicted of such an offense was "liable to suffer death, shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260-61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.[9] *See also, e.g.*, *A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

---

[9] The act provided that "the governour and council may make out of the offender's estate such an allowance as they shall think necessary for the maintenance of his wife and children" and, reflecting an American trend, provided that "no attainder for any offence hereby made felony shall work any corruption of blood, or [disinheritance] of heirs." 1777 Va. forgery law at 303; *see Wallach v. Van Riswick*, 92 U.S. 202, 210 (1875) (explaining that "[w]hen the Federal Constitution was framed," corruption of blood "was felt to be a great hardship, and even rank injustice").

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *accord Range*, 53 F.4th at 280-81 ("*A fortiori*, given the draconian punishments that traditionally could be imposed" for "non- violent" felonies including larceny, repeated forgery, and false pretenses, "the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible."). Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

### c.    Comparison to § 922(g)(1)

Both sets of historical traditions surveyed above demonstrate § 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. Of course, § 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses

43

punishable by more than one year of imprisonment. In any event, what the historical record shows is that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today. And history demonstrates that people who committed felonies at the time of the founding would have been exposed to far more severe consequences than disarmament including capital punishment and estate forfeiture.

It is of no moment that specific legislation prohibiting felons as a class from possessing firearms appears to be, as Gibson observes, "a creature of the 20th Century in the vast majority of the Nation." Gibson Br. 93. As an initial matter, felon-dispossession laws are themselves "longstanding" pillars of our Nation's legal system, and, notwithstanding their twentieth-century pedigree, the Supreme Court has endorsed these laws as consistent with its text-and-history

approach to the Second Amendment. *Heller*, 554 U.S. at 626.[10] But

perhaps more importantly, it is not necessary to mine the history for a

"dead ringer" or a "historical *twin*"—§ 922(g)(1) is "analogous enough" to

the array of English and early American historical precursors discussed

above "to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

In sum, § 922(g)(1) is consistent with the nation's historical

tradition of firearm regulation. Gibson cannot show that the district

court erred in failing to hold § 922(g)(1) unconstitutional.

## C.    At the very least, § 922(g)(1) is constitutional as applied to Gibson based on his prior conviction for violent felonies.

In any event, § 922(g)(1) is constitutional as applied to those like

Gibson who are dangerous felons. A few judges and commentators have

---

[10] Section 922(g)(1) can be directly traced back to a 1938 statute prohibiting individuals convicted of a limited list of "crime[s] of violence" from shipping, transporting, or receiving firearms. *See* Federal Firearms Act, Pub. L. No. 75-785, secs. 1(6), 2(e)-(f), 52 Stat. 1250, 1250-51 (1938). In 1961, Congress expanded that law to cover felonies generally, regardless of violence. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, sec. 2, 75 Stat. 757, 757 (1961). In 1968, Congress prohibited possession, in addition to reenacting the prohibitions on shipment, transportation, and receipt. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. VII, sec. 1202(a)(1), 82 Stat. 197, 236; *id.* at tit. IV, sec. 902, § 922(e)-(f), 82 Stat. at 230-31; *see also* Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, sec. 102, §§ 922(g)(1), 922(h)(1), 82 Stat. 1213, 1220 (reenacting and recodifying the prohibitions on shipping, transportation, and receipt); Firearms Owners' Protection Act, Pub. L. No. 99-308, secs. 102(6)(D), 104(b), 100 Stat. 449, 452, 459 (1986) (consolidating the prohibitions on shipping, transportation, possession, and receipt into 18 U.S.C. § 922(g)).

maintained that the Second Amendment allows disarming only dangerous felons. *See Kanter v. Barr*, 919 F.3d 437, 451, 454, 464 (7th Cir. 2019) (Barret, J., dissenting); *Folajtar*, 980 F.3d at 912-15 (Bibas, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257-67, 285-86 (2020). That minority view is incorrect because it lacks support in either *Heller*'s interpretation of the Amendment's text or the historical record. But Gibson could be disarmed on account of his felony status even under that minority view.

"[W]hether a government can forbid *violent* felons from possessing a firearm has not been meaningfully questioned by courts to date." *United States v. Gonzalez*, No. 22-1212, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (unpublished). And Gibson's underlying Indiana felony convictions for robbery (armed or bodily injury), burglary, criminal confinement, and dealing in a sawed-off shotgun were unquestionably violent. ROA.1533-34. Gibson, while armed with handguns and a sawed-off shotgun broke into the home of his victims and took money and property from them by putting them in fear or by using or threatening the use of force. ROA.1534. Gibson also bound the

victims with tape without their consent. ROA.1534. He cannot show

error in his conviction under § 922(g)(1).

### D.    Gibson's challenges to § 922(g)(1) based on the Fifth, Eighth, Ninth, and Tenth Amendments lack merit.

Gibson also argues that § 922(g)(1) also violates his rights under

the Fifth, Eighth, Ninth, and Tenth Amendments. This Court and

others have repeatedly rejected similar challenges. *See, e.g.*, *Lewis v.*

*United States*, 445 U.S. 55, 67 (1980) (finding that the legislature can

rationally find a greater danger is posed by felons' possession of

firearms than possession by unconvicted, ordinary persons); *Darrington*,

351 F.3d at 634-35 (rejecting Tenth Amendment challenge to §

922(g)(1), noting that this Court has recognized that "the statute is a

valid exercise of the congressional authority to regulate interstate

commerce" and that "the Tenth Amendment's reservation to the states

of power not conferred on the federal government in no way inhibits the

activities of the federal government in situations in which a power has

been so conferred") (cleaned up); *United States v. Broussard*, 80 F.3d

1025, 1041 (5th Cir. 1996) (rejecting Ninth Amendment challenge);

*United States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000) ("The circuits

have uniformly rejected the argument that the Ninth Amendment

encompasses 'an unenumerated, fundamental, individual right to bear firearms") (cleaned up); *United States v. Napier*, 233 F.3d 394, 404 (6th Cir. 2000) ("the Tenth Amendment . . . is not violated by a federal statute that outlaws a felon's possession of firearms" because "the statute is not directed at states as such, but at individual behavior"); *United States v. Jester*, 139 F.3d 1168, 1170 (7th Cir. 1998) (no violation of Eighth Amendment; "Section 922(g)(1) does not punish a person solely for his or her status as a convicted felon . . . ; [r]ather, the statute is triggered only when the felon commits the volitional act of possessing a firearm that has traveled in interstate commerce"); *United States v. McKenzie*, 99 F.3d 813, 818 (7th Cir. 1996) ("this circuit has rejected equal protection and due process challenges to § 922(g)(1)"); *United States v. Fauntleroy*, 488 F.2d 79, 81 (4th Cir. 1973) (rejecting argument that § 922(g)(1) violated the constitutional guarantee of due process in that it distinguishes felons from nonfelons). The Court should reject Gibson's challenges as well.

**Issue III:  The indictment was not defective. (Responsive to Gibson Issue IX, pp. 141-153)**

## Standard of Review

"In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999).

## Discussion

Gibson claims that the indictment was defective because it failed to "reflect" that the grand jury found that probable cause existed on the elements of the § 922(g)(1) offense he was charged with. But the grand jury's return of the indictment itself means that the grand jury found that the allegations in the indictment were supported by probable cause. *See Kaley v. United States*, 571 U.S. 320, 328 (2014); *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 442 (5th Cir. 2015). There is no requirement that an indictment explicitly say, just for form's sake, that the grand jury has "considered and found probable cause" on each element.

A sufficient indictment need only allege "each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *United States v. Threadgill*, 172 F.3d 357, 373 (5th Cir. 1999) (cleaned up). Gibson's indictment did this. It alleged that Gibson, knowing that he had previously been convicted of felony offenses (specified by the offense of conviction, case number, court, and date of conviction), knowingly and unlawfully possessed, "in and affecting commerce," firearms (described by type, make, and model). ROA.12.

Gibson also claims that the indictment was defective because it failed to "specifically" allege "how and whether the firearm possession was actual or constructive" and how was in or affected interstate commerce. Gibson Br. 143. But it's not necessary for an indictment "to allege in detail the factual proof that will be relied upon to support the charges." *United States v. Caldwell*, 302 F.3d 399, 412 (5th Cir. 2002) (cleaned up). And as the district court noted, this Court has held that alleging effects on interstate commerce "in conclusory terms, without evidentiary detail, is not fatally insufficient." ROA.186 (quoting *United*

*States v. Williams*, 679 F.2d 504, 506 (5th Cir. 1982)); *see also*

*Darrington*, 351 F.3d at 634. The district court did not err in rejecting

Gibson's challenges to the face of the indictment.

**Issue IV:  Gibson's sundry complaints that the government pursued judicial process unlawfully and failed to promptly present him to a judicial officer are meritless. (Responsive to Gibson Issue X, pp. 153-167)**

**Standard of Review**

In his tenth issue Gibson makes sundry complaints. The

government will address each in turn to the best it can. The Court

should not review some of them for Gibson's failure to adequately brief

his arguments.[11] *See United States v. Scroggins*, 599 F.3d 433, 446-47

---

[11] Some of these deficiencies are explained later, but a pervasive one throughout Gibson's brief is his failure to cite the record on appeal, as required by 5th Cir. R. 28.2.2, which has made it difficult to find places where, and whether, Gibson raised various issues in the district court. The briefing notice issued by the Clerk in this appeal directs that "You must use the proper citation format when citing the electronic record on appeal." Letter from Clerk to M. Gibson (Dec. 1, 2022). It further provided that "[p]ro se prisoners may request the record from the district court to prepare their briefs. If requested, the record will be sent to the warden." *Id*. While pro se briefs are liberally construed, pro se litigants must properly cite the record to preserve their arguments. *See, e.g.*, *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (noting pro se appellant's failure to "identify where the record substantiates" his contentions and that "[f]ailure to comply with the rules of this court regarding the contents of briefs can be grounds for dismissing a party's claims"); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993) (pro se parties are required to cite specifically to the record and that inadequately briefed arguments will not be preserved).

(5th Cir. 2010). Others should be reviewed for plain error[12] because Gibson did not present them before the district court, or if he did, the government could not find where he did because Gibson fails to provide citations to the record.

## Discussion

First, Gibson alleges that the government somehow violated procedural rules of the State of Texas and a Texas state judge's order by acquiring the firearms made the subject of the indictment from the Texas authorities who arrested him and originally took possession of the firearms. Gibson Br. 155-57. He provides no record support for these allegations. Nor does he supply any legal authority showing that the transfer of illegally possessed firearms from state to federal authorities violates federal law or that, even if it did, the remedy is suppression of evidence of the firearms or dismissal of the federal charges. In light of

---

[12] The plain-error standard is "a high hurdle." *United States v. Spalding*, 894 F.3d 173, 187 (5th Cir. 2018). To succeed on an unpreserved argument, a defendant must show that (1) there was error; (2) the error was plain, meaning "clear" or "obvious"; (3) it affected his substantial rights; and (4) it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Spalding*, 894 F.3d 173, 187 (5th Cir. 2018) (cleaned up).

all these failures, this Court should not consider Gibson's argument for failure to adequately brief it. *See Yohey*, 985 F.2d at 224-25.

Even if the Court considers the argument, it should review it for plain error, as Gibson points to no place in the record where he raised it before the district court. As explained above, Gibson fails to demonstrate that any violation of federal law occurred at all, let alone one that was plain, that affected his substantial rights, and that calls into question the integrity of judicial proceedings.

Next, Gibson suggests that "cumulative evidence" was "unfairly" put before the grand jury, Gibson Br. 157, but he does not develop the argument and has thus abandoned it for failure to adequately brief it. *Scroggins*, 599 F.3d at 446-47.[13]

---

[13] Gibson did argue below, under the rubric of "prosecutorial misconduct," that the indictment improperly alleged multiple predicate felony convictions. ROA.187. To the extent he means to raise the same claim here, the Court should reject the claim as the district court did. The court noted that "the government is not ordinarily limited to the proof of only one felony conviction when proof of a previous conviction is an element of its case." ROA.188 (citing *United States v. Bruton*, 647 F.2d 818, 825 (8th Cir. 1981)). The court further noted that Gibson could have "avoid[ed] the potential prejudice of having the jury hear evidence of more than one prior felony conviction by agreeing to stipulate to his status as a previously convicted felon at trial." ROA.188. Gibson did not do that, however, and instead, as was his right, put the government to its burden of proof at trial. It met that burden.

Next, Gibson complains about the delay that occurred between his indictment on federal charges in this case and his federal arrest. Gibson Br. 158-59. Gibson points to no place in the record where he made such a claim in the district court.[14] Accordingly, the Court should review the claim for plain error.

The facts are these. A federal grand jury returned an indictment against Gibson, charging a violation of § 922(g)(1), on June 17, 2021. ROA.12. The indictment was sealed at the time it was returned. That same day, the court issued an arrest warrant for Gibson on the indictment, which was also sealed at the time. ROA.16. On February 2, 2022, the government filed a petition for writ of habeas corpus *ad prosequendum* directing that Gibson be brought from Indiana, where he was then incarcerated, to the Eastern District of Texas for an initial appearance on the federal charge. ROA.17-18. The magistrate judge granted the petition and issued the writ the same day. ROA.20-21.

---

[14] Gibson did complain below about the government's alleged delay in "procuring the indictment from the grand jury" and that the government allegedly violated his *constitutional* right to a speedy trial under the Sixth Amendment, which the district court addressed under the *Barker v. Wingo* framework. ROA.189. But Gibson does not challenge the district court's rejection of the constitutional claim on appeal. Rather, he contends that the government violated § 3161(j)(1). Gibson Br. 159-60.

Gibson was arrested on the federal charge on March 9, 2022,[15] ROA.23,

and entered his initial appearance the next day, ROA.22.

So far as it appears, Gibson complains about the gap between the

return of the indictment and issuance of the arrest warrant on June 17,

2021, and the execution of the arrest warrant on March 9, 2022.[16] For

support, he relies on 18 U.S.C. § 3161(j)(1), which provides:

> (j)(1) If the attorney for the Government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly —
>
> (A)  undertake to obtain the presence of the prisoner for trial; or
>
> (B)  cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.

18 U.S.C. § 3161(j)(1). "Pursuant to this statutory subsection, the

government attorney's obligations are triggered only if the 'person

---

[15] Gibson makes offhand accusations that the arrest warrant return was "falsified," *e.g.*, Gibson Br. 161, but the government cannot even respond to the argument because Gibson points to no record evidence nor any place where he raised the claim in the district court.

[16] Gibson makes an offhand statement in his brief that the government "ignor[ed] the mandates of the Speedy Trial Act" and his "right to receive a trial within 70-days of the unsealing of the indictment" under 18 U.S.C. § 3161(c)(1). Gibson Br. 159. While, as explained above, Gibson raised a constitutional speedy-trial claim in the district court, he points to no place where he raised a statutory one. In any event, any such claim would be baseless because Gibson's initial appearance before the magistrate judge took place on March 10, 2022, ROA.22, and Gibson's trial began on April 26, 2022, ROA.348, less than 70 days later.

charged with an offense is serving a term of imprisonment in any penal institution.'" *United States v. Anderton*, 752 F.2d 1005, 1007 (5th Cir. 1985) (quoting § 3161(j)(1)). What's more, "according to the plain terms of the statute, ordinarily a condition precedent to the triggering of the statute's obligations" is that the government attorney knows of the defendant's status. *Id*. Gibson says, again without any record support, that he was "continuous[ly] confine[d]" in Indiana between the time he was extradited there in April 2021 after his arrest on Texas state charges in March 2021 and when he was brought by writ to the Eastern District of Texas for his initial appearance on the federal § 922(g) charge. Gibson Br. 158. But even so, he points to no evidence in the record that the federal prosecutor *knew* that Gibson was "serving a term of imprisonment in any penal institution" during this time. Gibson just *says* that "the Government attorney was aware and should have known" of his status. Gibson Br. 158-59. Gibson has thus failed to show, let alone plainly show, that the government violated § 3161(j)(1). Nor has he shown that even if there was a violation how his substantial rights were affected or how the violation affected the integrity of judicial proceedings.

But even if the government somehow violated § 3161(j)(1), Gibson hasn't shown any effect on his substantial rights because § 3161(j)(1) "provides no sanction for its violation." *Anderton*, 752 F.2d at 1008. Nor does Gibson show that he suffered any prejudice from any delay. *Id*. (explaining that the defendant "does not complain of oppressive pretrial confinement or of an impairment of his ability to present a defense because of an impairment of proof"). Nor does he show, as opposed to merely allege, that the government acted out of an improper prosecutorial motive. *Id*. In short, "[t]he record in this case lacks any showing of prejudice to [Gibson] caused by the delay[.]" *Id*.

**Issue V:    The district court had subject-matter jurisdiction. (Responsive to Gibson Issue XI, pp. 168-172)**

**Standard of Review**

Finally, Gibson argues that the district court lacked "lawful jurisdiction" over this case because the government failed to invoke or cite 18 U.S.C. § 3231 or § 1355 in any of its court papers below. This Court review's the district court's determination of subject-matter jurisdiction de novo. *See Kaluza*, 780 F.3d at 653.

## Discussion

Gibson's claim that some sort of code pleading requirement exists in the criminal realm lacks merit. *See generally United States v. Uni Oil, Inc.*, 710 F.2d 1078, 1080 n.1 (5th Cir. 1983) ("in the absence of substantial prejudice to a party, it is too late in the day to revive the kind of hyper-technical reading of legal papers that might have prevailed under a nineteenth-century code pleading system"). The district court had subject-matter jurisdiction over this criminal case because the indictment alleged that Gibson committed an offense against the laws of the United States, having violated 18 U.S.C. § 922(g)(1). *See United States v. Scruggs*, 714 F.3d 258, 262 (5th Cir. 2013) ("That is the extent of the jurisdictional analysis: A federal criminal case is within the subject matter jurisdiction of the district court if the indictment charges . . . that the defendant committed a crime described in Title 18 or in one of the other statutes defining federal crimes") (cleaned up).

## Conclusion

The Court should affirm Gibson's conviction.

Respectfully submitted,

Brit Featherston
United States Attorney
Eastern District of Texas

/s/ *Bradley Visosky*
Bradley Visosky
Assistant U.S. Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
Telephone: (972) 509-1201

Attorneys for the United States

## Certificate of Service

I certify that on April 7, 2023, a copy of this brief will be served on Gibson by sending to him through CM/RRR at the following address:

Marland Henry Gibson
 #952537
Indiana Department of Corrections - Westville
5501 South 1100, W.
Westville, IN 46391

/s/ *Bradley Visosky*
Bradley Visosky

## <u>Certificate of Compliance</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 12,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Word for Office 365 in a proportionally spaced typeface in 14-point size, with footnotes in 12-point size.

/s/ *Bradley Visosky*
Bradley Visosky